United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 26, 2005**

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
for the Fifth Circuit

————————

m 04-50118

————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

DANIEL ANGELES-MENDOZA,

Defendant-Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

————————

m 04-50119

————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

FELIPE CERON-ESPINOZA,

Defendant-Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ERIK ANGELES-MENDOZA,

Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and
    BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In these consolidated appeals, defendants challenge adjustments made to their sentencing ranges under the United States Sentencing Guidelines.[1] Although the district court correctly decided most of the issues on appeal, it did err in applying the vulnerable victim adjustment, U.S.S.G. § 3A1.1(b)(1). For this reason, we vacate and remand for resentencing in light of *United States v. Booker*, 125 S. Ct. 738 (2005), *United States v. Mares*, 402 F.3d 511 (5th Cir. 2005), *petition for cert. filed* (Mar. 31, 2005) (No. 04-9517), and their progeny.

I.

Erik Angeles-Mendoza, Felipe Ceron-Espinoza, and Daniel Angeles-Mendoza pleaded guilty to two counts of conspiracy to smuggle, transport, and harbor illegal aliens, 8 U.S.C. § 1324(a)(1)(A), and a charge of possession of a firearm by an illegal alien, 18 U.S.C. § 922(g)(5). According to the factual basis for the guilty pleas, police discovered twenty-nine illegal aliens, including defendants, at an Austin stash house. The smuggling operation picked up illegal aliens in Mexico in pickup trucks that had been modified by removing the passenger seats to allow them to fit more aliens inside.

---

[1] All references to the guidelines are to the 2002 version, which were in effect when the criminal conduct took place.

2

Once at the stash house, the smuggled aliens were held until defendants received fees for the transport. To deter escape, defendants took the aliens' shoes and socks, and guarded them in the boarded-up and locked stash house with a shotgun. All three defendants were identified by smuggled aliens to be the "enforcers" at the house who patrolled with the shotgun and made calls to the aliens' relatives to collect fees.

At sentencing, the district court applied upward adjustments based on findings that the smuggling operation involved over one hundred aliens, that a weapon was brandished during the offense, that the aliens were physically restrained during the offense, that the defendants took advantage of the aliens' vulnerabilities, and that the aliens were recklessly endangered by the methods by which they were smuggled. The court applied a downward adjustment for acceptance of responsibility only to Daniel Angeles-Mendoza, because it doubted the sincerity of the others in their guilty pleas. The court also denied Ceron-Espinoza's request for a downward adjustment based on his claim that he played only a minimal role in the offense, finding that he was an average participant in the conspiracy. The court ultimately sentenced Erik Angeles-Mendoza to concurrent 108-month terms of imprisonment and to concurrent three-year periods of supervised release, and Daniel Angeles-Mendoza to concurrent 78-month terms of imprisonment and to concurrent three-year periods of supervised release.

## II.

Defendants bring a variety of challenges to the method used to calculate their sentencing ranges under the guidelines. Although the Court in *Booker* excised and struck down the statutory provisions that made the guidelines mandatory,[2] a district court is still *required* to calculate the guideline range and consider it advisory.[3] Under *Booker*, we still review the district court's interpretation and application of the guidelines *de novo*. *United States v. Villegas*, 2005 U.S. App. LEXIS 4517, at *8 (5th Cir. Mar. 17, 2005) (per curiam). We thus proceed to review each of the challenges to the district court's application of the guidelines.

## III.

Defendants challenge the two-level enhancement to their offense level pursuant to

---

[2] *Booker*, 125 S. Ct. at 764 (opinion of Breyer, J.) ("[W]e must sever and excise two specific statutory provisions: the provision that requires sentencing courts to impose a sentence within the applicable Guidelines range (in the absence of circumstances that justify a departure), see 18 U.S.C. §3553(b)(1) (Supp. 2004), and the provision that sets forth standards of review on appeal, including *de novo* review of departures from the applicable Guidelines range, see § 3742(e) (main ed. and Supp. 2004).").

[3] *Id.* at 756-57; *Mares*, 402 F.3d at 518-19 ("Even in the discretionary sentencing system established by [*Booker*], a sentencing court must still carefully consider the detailed statutory scheme created by the [Sentencing Reform Act] and the Guidelines which are designed to guide the judge toward a fair sentence while avoiding sentence disparity . . . . This duty to 'consider' the Guidelines will ordinarily require the sentencing judge to determine the applicable Guidelines range even though the judge is not required to sentence within that range.").

U.S.S.G. § 3A1.1(b)(1), which applies where an offender "knew or should have known that a victim of the offense was a vulnerable victim." For the upward enhancement to apply, the victim must be "unusually vulnerable due to age, physical or mental condition, or . . . otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, cmt. 2 n.1. We review the district court's interpretations of the guidelines *de novo* and its factual finding of unusual vulnerability for clear error.[4]

The court did not err in finding that the smuggled aliens were "victims" for purposes of § 3A1.1(b)(1). Defendants cite *United States v. Velasquez-Mercado*, 872 F.2d 632, 636 (5th Cir. 1989), in which we noted that for purposes of similar federal criminal charges for smuggling and concealing aliens, the transported persons might appropriately be considered "customers" of the defendants rather than "victims" of the offense, because they *voluntarily* joined the scheme as willing participants as to its objectiveSSto be brought illegally into the United States. The *Velasquez-Mercado* panel, however, used the 1988 version of the guidelines, which did not include the commentary, added in 1997, that clarified the meaning of "victim" in applying the enhancement: "For purposes of subsection (b), "victim" includes any person who is a victim of the offense of conviction *and any conduct for which the defendant is accountable under § 1B1.3*." U.S.S.G. § 3A1.1, cmt. n.2 (1997) (emphasis added).

This court has determined that a person can be held captive, and thus victimized, under a different federal criminal statuteSSthe Hostage Taking ActSSeven where the seizure or detention was not against the hostage's will at its inception. *See United States v. Carrion-Caliz*, 944 F.2d 220, 226 (5th Cir. 1991). Because the smuggled aliens were detained against their will after being transported, they are "victims" with regard to conduct relevant to the offenses for which defendants pleaded guilty, and thus a § 3A1.1 adjustment would be appropriate if they have a qualifying vulnerability about which defendants knew or should have known.

On the other hand, the district court did commit clear error in finding that an enhancement was appropriate, because it failed to find that the victims were *unusually* vulnerable to the offense as required under § 3A1.1(b)(1), cmt. n.2. In granting the enhancement, the court made scant, generalized findings; it merely stated for the record that aliens coming from Mexico and other countries from the south seek to come under ". . . economic and physical stress, seeking work, seeking food, seeking to support their families, and for someone or more people to take advantage of that mind-set, holding them, in effect, hostage. . . ." This misses the mark for a qualifying vulnerability under § 3A1.1, which we have previously required to be an "*unusual* vulnerability which is present in only some victims of that type of crime."[5]

The guidelines represent Congress's determination, through the Sentencing Commission, of how much punishment a particular crime

---

[4] *United States v. Brugman*, 364 F.3d 613, 621 (5th Cir.) (citing *United States v. Lambright*, 320 F.3d 517, 518 (5th Cir. 2003)), *cert. denied*, 125 S. Ct. 212 (2004).

[5] *United States v. Moree*, 897 F.2d 1329, 1335 (5th Cir. 1990) (emphasis added); *see United States v. Wetchie*, 207 F.3d 632, 634 (9th Cir. 2000) (defining an unusually vulnerable victim as one who is "less able to resist than the typical victim of the offense of the conviction").

deserves, taking into account the inherent nature of the type of offense. The district court only noted general characteristics commonly held by aliens seeking to be illegally smuggled and failed to mention a characteristic the defendant knowingly took advantage of, such that the offense demonstrated the "extra measure of criminal depravity which § 3A1.1 intends to more severely punish."[6] Although the court may have been correct in noting the *inherent* vulnerability of smuggled aliens, we assume that such a characteristic was adequately taken into account in establishing the base offense level in U.S.S.G. § 2L1.1.[7]

The government argues that the level of vulnerability "exceeded the type of vulnerability that might ordinarily accompany smuggling and harboring aliens" based on the fact that they were physically restrained until payment for their transport was received. As we have noted, however, the holding of aliens pending payment is not an unusual practice where they have not paid in advance for their transport.[8] Although the physical restraint of the smuggled aliens during the commission of the offense may have been appropriately used to grant an upward enhancement under U.S.S.G. § 3A1.3SSthe guidelines provision dealing specifically with physical restraint of victimsSSthere is no evidence that the aliens in this case were *more unusually vulnerable* to being held captive than would be any other smuggled alien involved in a violation of § 1324.[9]

IV.

Defendants object to the assessment of a nine-level enhancement, pursuant to U.S.S.G. § 2L1.1(b)(2)(C), based on a finding that the number of smuggled aliens exceeded one hundred. This increase was recommended in Erik Angeles-Mendoza's Presentence Report ("PSR"), but not in Daniel Angeles-Mendoza's or Carron-Espinoza's, both of whose PSR's recommended only a six-level increase pursuant to U.S.S.G. § 2L1.1(b)(2)(B)SSbased solely on the twenty-six aliens discovered to be detained at the stash house.

---

[6] *Moree,* 897 F.2d at 1335; *United States v. Robinson*, 119 F.3d 1205, 1219 (5th Cir. 1997) ("Application of the vulnerable victim guideline is limited to cases in which the victims 'are in need of greater societal protection' and the offenses are thus 'more criminally depraved than they would be otherwise.'") (quoting *United States v. Castellanos*, 81 F.3d 108, 110 (9th Cir. 1996)).

[7] This is not to say that the inherent vulnerability of smuggled aliens may never be used as a qualifying vulnerability for purposes of a § 3A1.1 upward adjustment; other crimes that do not necessarily involve smuggled aliens might involve more depravity and thus might render the defendant eligible for the adjustment where the crime is directed toward aliens to take advantage of their inherent vulnerabilities. *Cf. United States v. Amedeo*, 370 F.3d 1305, 1317 n.10 (11th Cir. 2004) (applying § 3A1.1 enhancement where defendant raped victim after giving her drugs, where defendant knew that the victim was a drug addict from his former legal representation of her; noting that not every drug addict is a vulnerable victim under § 3A1.1).

[8] *See United States v. Patino-Cardenas*, 85 F.3d 1133, 1134-35 (5th Cir. 1996); *United States v. Briones-Garza*, 680 F.2d 417, 419 (5th Cir. 1982).

[9] The district court also may have made its decision to grant the upward enhancement based on the fact that some of the aliens were minors. There is no evidence, however, that the youth of some of them made them especially vulnerable to being victimized.

### A.

Although Daniel Angeles-Mendoza and Carron-Espinoza conceded that they received oral notice of the government's intent to object to the PSR's recommendation that they receive only a six-level enhancement, they objected to the fact that they did not receive timely *written* notice under rule 32 of the Federal Rules of Criminal Procedure. According to rule 32(f)(1), "Within 14 days after receiving the presentence report, the parties must state *in writing* any objections, including objections to material information, sentencing guideline ranges, and policy statements contained in or omitted from the report." (Emphasis added.)

Rule 32(i)(1)(D), however, gives the district court broad discretion over this matter in that it "may, for good cause, allow a party to make a new objection at any time before sentence is imposed." FED. R. CIV. P. 32(i)(1)(D); *see also United States v. Wheeler*, 322 F.3d 823, 827 (5th Cir. 2003). Although the government may have violated rule 32(f)(1) by failing to give timely notice in writing, the court did not abuse its discretion in allowing the government to make its objection at the sentencing hearing, based on the fact that the government had demonstrated some measure of "good cause,"[10] and the omission caused no no prejudice[11] to these defendants' ability to prepare adequately for sentencing: Defendants both had actual knowledge of the government's position before the hearing and presented a defense to the use of the ledger to support a nine-level enhancement under § 2L1.1(b)(2)(C).[12] Moreover, our precedents even would have allowed the court *sua sponte* to impose upward enhancements where the defendant had no explicit knowledge of the possibility of such an enhancement but was aware of its underlying facts.[13]

---

[10] The government presented evidence that confusion was created over the fact that a different probation officer was assigned to Daniel Angeles-Mendoza and Carron-Espinoza than was assigned to Erik Angeles-Mendoza. According to the government, the probation officer assigned to Daniel Angeles-Mendoza and Carron-Espinoza did not have an opportunity to review the ledger before drafting their PSR, which is the source of the discrepancy.

[11] Although "good cause" is not specifically defined by rule 32 and would seem to suggest that the inquiry only concerns the grounds for the defaulting party's omission, "in practice 'good cause' inquiries typically range more broadly, addressing (for instance) adverse effectsSSdirect or systemicSSon opposing parties or the judiciary." *United States v. McCoy*, 313 F.3d 561 (D.C. Cir. 2002) (considering prejudice in determining whether good cause existed to allow a new objection to be presented at sentencing pursuant to rule 32(i)(1)(D)); *cf. Southwestern Bell Tel. Co. v. City of El Paso,* 346 F.3d 541, 546 (5th Cir. 2003) (stating the test for considering whether "good cause" has been shown in allowing an untimely amendment to pleading includes consideration of "potential prejudice in allowing the amendment"); *cf. Effjohn Int'l Cruise Holdings, Inc., v. A&L Sales, Inc.*, 346 F.3d 552, 563 (5th Cir. 2003) (considering prejudice in determining whether "good cause" exists for court to set aside entry of default).

[12] "The touchstone of rule 32 is *reasonable* notice" to allow counsel adequately to prepare a meaningful response and engage in adversary testing at sentencing. *United States v. Andrews*, 390 F.3d 840, 845 (5th Cir. 2004).

[13] *United States v. Marmolejo,* 89 F.3d 1185, 1201 (5th Cir. 1996) (stating that "if the defendant has actual knowledge of the facts on which the

(continued...)

## B.

Defendants argue that the district court erred in applying the § 2L1.1(b)(2)(C) adjustment, because there was insufficient evidence to demonstrate that more than one hundred aliens were involved in the smuggling operation. "For sentencing purposes, the district court [could] consider any relevant evidence 'without regard to its admissibility under the rules of evidence applicable at trial, provided that the information [had] sufficient indicia of reliability to support its probable accuracy.'" *United States v. Young*, 981 F.2d 180, 185 (5th Cir. 1992) (quoting U.S.S.G. § 6A1.3).

Again, we review the district court's application of the guidelines *de novo* and its factual findings for clear error. *United States v. Ho*, 311 F.3d 589, 608 (5th Cir. 2002). "If the district court's account of the evidence is plausible in light of the record when viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *United States v. Alfaro*, 919 F.2d 962, 966 (5th Cir. 1990).

There is no clear error in the finding that more than one hundred aliens were involved in the smuggling operation. The government presented evidence in the form of Agent Hernandez that the ledger discovered at the stash house had approximately 114 unique names, some of which were names of illegal aliens discovered at the residence.[14] Although defendants correctly point out that fewer than one hundred of the names included phone numbers and contact information, the court did not commit clear error by crediting Hernandez's testimony that the discrepancy was a result of different authors contributing to different parts of the ledger with varying recording methods, particularly in light of other evidence demonstrating the expansive nature of the smuggling operation.[15] Defendants offer an abundance of other theories and explanations for the names in the ledger, which may in fact be correct, but they do not make the finding, rejecting those theories, clearly erroneous in light of the record as a whole.

## V.

---

[14] Ledgers seized at crime scenes can be used as competent evidence at sentencing hearings. *See, e.g., United States v. Garza*, 118 F.3d 278, 286 (5th Cir. 1997); *United States v. Fierro*, 38 F.3d 761, 774 (5th Cir. 1994); *United States v. Thomas*, 12 F.3d 1350, 1369 (5th Cir. 1994).

[15] There was evidence of another stash house in Houston, connected to the defendants by eight to nine other ledgers discovered there referencing one of the defendants by name, identification documents of Daniel and Erik Angeles-Mendoza, including a driver's licence, and shotgun shells matched ballistically to the shotgun recovered at the stash house. Furthermore, Hernandez testified that one of the smuggled aliens in this case heard Daniel Angeles-Mendoza refer to another stash house they operated. The PSR includes other evidence of the extensiveness of the operation, including reference to an admission by another individual that he had transported six loads of aliens, including four of them to the Austin stash house.

---

[13](...continued)
district court bases an enhancement or a denial of a reduction, the Sentencing Guidelines themselves provide notice of the grounds relevant to the proceeding sufficient to satisfy the requirements of Rule 32") (internal citations omitted), *aff'd sub nom. United States v. Salinas*, 522 U.S. 52 (1997); *United States v. Knight*, 76 F.3d 86, 88 (5th Cir. 1996) (holding that sufficient notice exists for upward enhancements for factors presently in the guidelines to allow average defense counsel adequately to prepare for sentencing).

Daniel Angeles-Mendoza and Ceron-Espinoza object to the district court's application of a two-level adjustment made on the basis that the "offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person . . . ." U.S.S.G. § 2L1.1(b)(5). Reckless conduct to which the adjustment applies includes "a wide variety of conduct (*e.g.* transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition)." U.S.S.G. § 2L1.1, cmt. n.6.

In light of the record as a whole, the court did not commit clear error in its findings that defendants smuggled aliens in the back of their truck and modified the vehicle to allow more smuggled aliens to fit in by removing the back seats.[16] The court did not err in applying a § 2L1.1(b)(5) adjustment, because *United States v. Cuyler,* 298 F.3d 387 (5th Cir. 2002), dictates that the adjustment is appropriate where the smuggled aliens are transported in the bed of a pickup truck.[17]

---

[16] According to several witnesses, aliens were placed in the bed of the truck and covered with a tarp or a "heavy rubber cover," and the cab of the truck was overcrowded, at times carrying as many as ten people. Additionally, the PSR indicated that the organization removed the passenger seats to make the vehicles "compatible for the transportation of more people," and the vehicle found at the Austin stash house was so modified.

[17] *Cuyler* did not deal with the issue of modifying vehicles to allow extra passengers to fit, but it approvingly cited cases from other circuits that were more on point for that aspect of this case. *See id.* at 390-91 (citing *United States v. Ramirez-*
(continued...)

---

[17](...continued)
*Martinez*, 273 F.3d 903, 916 (9th Cir. 2001) ("[P]utting twenty people in a dilapidated van without seats or seat belts undoubtedly constitutes 'carrying substantially more passengers than the rated capacity of a motor vehicle' . . ., or harboring persons in a crowded, dangerous or inhumane condition."; affirming enhancement under § 2L1.1-(b)(5)); *United States v. Angwin*, 271 F.3d 786, 808-09 (9th Cir. 2001) (holding that district court did not abuse its discretion in applying § 2L1.1-(b)(5) where there were sixteen people in motor home rated for six people, aliens were crowded into small compartments, and none of them were seated or wearing a seat belt); *United States v. Ortiz*, 242 F.3d 1078, 1078-79 (8th Cir. 2001) (stating that district court did not clearly err in applying § 2L1.1(b)(5) where defendant transported 23 illegal aliens in van designed to accommodate 14 people, there were not enough seat belts, and the van overturned, injuring the passengers); *United States v. Rio-Baena*, 247 F.3d 722, 723 (8th Cir. 2001) (finding no clear error in applying § 2L1.1(b)(5) where defendant crowded 21 illegal aliens into back of cargo van without seats or seat belts)).

The defendants claim that *Cuyler* is inapplicable because it requires a finding that the truck was being operated at highway speeds, but that argument is unconvincing. Over the long distances that the aliens were transported in this operation, there existed the similar, substantial risk that the aliens might "be thrown from the bed of the pickup in the event of an accident or other driving maneuver of the sort." *Cuyler*, 298 F.3d at 391. Defendants' argument that a higher level of dangerousness needs to be demonstrated to apply the enhancementSSthat there needed to be evidence that the individuals would suffer from oxygen deprivation or have trouble extricating themselves from the vehicle based on *United States v. Dixon,* 201 F.3d 1223 (9th Cir. 2000)SSwas explicitly rejected in *Cuyler*. *See Cuyler*, 298 F.3d at 389-90 (rejecting
(continued...)

Daniel Angeles-Mendoza argues that the adjustment should not apply to him, because his only connection to the modified truck was that it was parked outside the house where he was arrested. In granting sentencing adjustments, however, the district court is not limited to considering acts of a particular defendant, but may also consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly taken criminal activity," irrespective of whether it was actually charged as a conspiracy. U.S.S.G. § 1B1.3(a)-(1)(B).[18] Although it was Erik Angeles-Mendoza who was identified as the driver of the truck, it was not clearly erroneous for the district court to find that the potentially dangerous method in which the aliens were transported was reasonably foreseeable to Daniel Angeles-Mendoza, given evidence of his proximity to the altered vehicle,[19] the fact that his brother was responsible for driving the aliens, and evidence of his leadership role within and extensive knowledge of the organization.[20]

---

[17](...continued)
application of same case, noting that the factors highlighted in *Dixon* "do not limit the guideline").

[18] *See also United States v. Morris*, 46 F.3d 410, 422 (5th Cir. 1995).

[19] The modified truck was found outside the stash house where Daniel Angeles-Mendoza was arrested, and evidence indicated he handled the aliens when they were dropped off there.

[20] Daniel Angeles-Mendoza worked as the "enforcer" at the Austin stash house. Additionally, there were indications that he knew the expansiveness of the organization; he admitted knowledge of another stash house, and his identification was (continued...)

## VI.

Daniel Angeles-Mendoza and Ceron-Espinoza object to the application of a two-level adjustment pursuant to U.S.S.G. § 3A1.-3, which authorizes such an enhancement "[i]f a victim was physically restrained in the course of the offense." According to the application notes, the definition of "physical restraint" for purposes of the adjustment is found in § 1B1.1 and reads: "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. §§ 1B1.1, 3A1.3, cmt. n.1(h).

The record contains ample evidence that the smuggled aliens were physically restrained; the factual basis of the guilty pleas established that the door was locked with a deadbolt, the windows were boarded up, and a guard patrolled the premises with a shotgun. Further, the PSR indicates that the aliens had to surrender their socks and shoes to make escape more difficult, and they were threatened with being shot in the legs if they attempted to escape.

Despite the aforementioned findings, defendants argue that the adjustment is inappropriate here because the victims supposedly "consented" to the restraint; there is evidence that the aliens were awareSSfrom before the time when they agreed to be smuggledSSthat they would not be permitted to leave the stash house until payment was received. The fact that they needed to be kept in check by physical barriers and threats of force belies, however, any contention that they continued to consent to be kept at the stash house. Their freedom to move where they wished was forcibly curtailed, and they were thus "physically restrained" under the plain meaning of

---

[20](...continued)
found at a similar Houston site.

the guidelines.[21]

Defendants also argue that the application of the enhancement is inappropriate double counting because the offense level was also increased for brandishing a firearm. This argument is without merit, because double counting "is impermissible only where the guidelines at issue prohibit it," and § 3A1.3 does not prohibit double counting.[22] The district court did not commit error, and certainly not clear error, in finding that the aliens were physically restrained because of how they were confined at the stash house, making the upward adjustment proper under § 3A1.3.

## VII.

Ceron-Espinoza argues that the district court erred in refusing to grant him a downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1, which states that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense," his offense level is decreased by two levels. A defendant who enters a guilty plea is not entitled to the adjustment as a matter of right; in connection with a plea, the court is instructed to consider whether defendant truthfully admitted the conduct comprising the offense, including additional relevant conduct for which he is responsible.[23] We review the sentencing court's determination of acceptance of responsibility with even more deference that is due under a clearly erroneous standard because the sentencing judge is in a unique position to assess the defendant's acceptance of responsibility and true remorse.[24]

The court was within its discretion in adopting the probation officer's finding that Ceron-Espinoza did not adequately accept responsibility because of contradictory statements that he made before the court at various stages, leading up to his plea of guilty. The record indicates that at one point he asserted that he was merely a smuggled alien himself who was forced to work in the kitchen to pay his transport fee, yet evidence demonstrated that he was actively involved in confining the smuggled aliens by threatening to shoot them or break their legs if they tried to escape. Additionally, he initially denied that he had ever possessed the recovered shotgun, but later he admitted to it.

Although Ceron-Espinoza pleaded guilty, the district court was within its bounds of discretion to conclude that he was trying to misrepresent facts to minimize his role in the

---

[21] In other contexts, we have found that the initial acquiescence of a victim does nor foreclose a finding that he is a hostage where force is later used to seize or confine him. *Cf. Carrion-Caliz*, 944 F.2d at 225-26 (applying the Hostage Taking Act).

[22] *United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996); U.S.S.G. § 3A1.3. The application notes to § 3A1.3 only dictate that the adjustment is inapplicable "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself." U.S.S.G. § 3A1.3, cmt. n.2. The specific offense guideline applicable in this case, § 2L1.1, does not specifically incorporate the element of physical restraint, so that limitation is inapplicable.

[23] *See* U.S.S.G. § 3E1.1*,* cmt. n.3; *see also United States v. Pierce*, 237 F.3d 693, 694 (5th Cir. 2001).

[24] *See* U.S.S.G., § 3E1.1, cmt. n.5.; *see also United States v. Nguyen*, 190 F.3d 656, 659 (5th Cir. 1999); *United States v. Rodriguez*, 942 F.2d 899, 902-03 (5th Cir. 1991).

offense. Under these circumstances, particularly under our extremely deferential standard of review, the court committed no reversible error in deciding that Ceron-Espinoza had insufficiently accepted responsibility to deserve a downward adjustment under § 3E1.1.

## VIII.

Ceron-Espinoza argues that the district court erred in denying him a reduction in his offense level based on having a mitigating role in the offense, pursuant to U.S.S.G. § 3B1.2, which provides for a four-level reduction if the defendant is a "minimal participant," and a two-level reduction if he is a "minor participant." A "minimal participant" is one who is "plainly among the least culpable of those involved in the conduct of a group," and who demonstrates a lack of knowledge or understanding of the scope and structure of the enterprise. § 3B1.2, cmt. n.4. A "minor participant" is one who is "less culpable than most other participants, but one whose role could not be described as minimal." § 3B1.2, cmt. n.5.

A defendant has the burden of showing that he is entitled to the adjustment, and to qualify he must demonstrate that he is "substantially less culpable than the average participant."[25] The determination of the applicability of this downward adjustment is a question of fact that we review for clear error. *See United States v. Virgen-Moreno*, 265 F.3d 276, 296 (5th Cir. 2001).

The district court was not clearly erroneous in finding that Ceron-Espinoza was an average participant and thus not deserving of a down-

ward adjustment under § 3B1.2. Although Ceron-Espinoza correctly points to the testimony of several witnesses who indicated that they only knew him to cook and clean around the stash house, there was competent evidence on the record that he was the enforcer at the site; that he was one of three individuals in charge of the stash house, at times wielding the shotgun and issuing threats to the detained aliens.

Other evidence showed that Ceron-Espinoza had knowledge of the scope and structure of the enterprise, in that he knew of how the aliens were smuggled and detained until payment was received for their transport. Even if Ceron-Espinoza played a relatively smaller role in the offense as compared to his other co-defendants, viewing the records as a whole the district court did not commit clear error in finding that he played a significant role, such that he was an average participant and not deserving of a downward adjustment based on § 3B1.2.

## IX.

The defendants argue that under *Booker*, their sentences violate their Sixth Amendment right to findings by a jury, because the district court assessed sentencing enhancements under the then-mandatory sentencing guidelines, based on facts that were neither admitted by them nor found by a jury beyond a reasonable doubt  As we have explained, the district court did not properly calculate the vulnerable victim adjustment, § 3A1.1(b)(1). Even though *Booker* renders the guidelines advisory, a sentencing court must first arrive at the proper guideline calculation before deciding which sentence to impose.[26]

---

[25] *United States v. Garcia*, 242 F.3d 593, 598 (5th Cir. 2001) (quoting U.S.S.G. § 3B1.2, cmt. n.3(A)).

---

[26] *See supra* note 3. The sentences here are
(continued...)

11

Moreover, as we noted in *Villegas*, 2005 U.S. App. LEXIS 4517, at *15, *Booker* did not invalidate 18 U.S.C. § 3742(f)(1), which still provides:

> If the court of appeals determines that . . . the sentence was imposed in violation of law or imposed as a result of an incorrect application of the sentencing guidelines, the court shall remand the case for further sentencing proceedings with such instructions as the court considers appropriate.

Because the sentences in the instant case were applied when the guidelines were deemed mandatory, there is no doubt that the sentences were imposed *as a result of* an incorrect application of § 3A1.1. We must therefore remand for resentencing.[27]

The judgments of sentence are VACATED, and these matters are REMANDED for further proceedings in accordance with this opinion and with *Booker*, *Mares*, and their progeny.

---

[26](...continued) what, according to *Mares*, are now termed [] "'non-Guideline' sentence[s] to distinguish [them] from [] Guidelines sentence[s] which include[] [sentences that have] been adjusted by applying a 'departure' as allowed by the Guidelines." *Mares*, 402 F.3d at 519 n.7.

[27] Daniel Angeles-Mendoza also argues that *Booker* requires that his sentence be vacated and remanded, although he concedes that we would review this for plain error, since he failed to object on Sixth Amendment grounds. We do not consider this issue, because we have already determined that his sentence needs to be vacated based on the fact that the district court improperly assessed the defendant a vulnerable victim adjustment under § 3A1.1.