United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 25, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————

No. 04-10813

———————————————

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

    v.

MARIA ELENA GARZA AND ENRIQUE ELIZONDO,

                                        Defendants - Appellants.

———————————————

Appeals from the United States District Court
for the Northern District of Texas
3:03-CR-395

———————————————

Before BENAVIDES, STEWART, and OWEN, Circuit Judges.

PER CURIAM:

    Enrique Elizondo and Maria Elena Garza appeal their convictions and sentences. We find no error in any conviction. We affirm Garza's sentence but must vacate and remand Elizondo's sentence for proceedings consistent with *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005).

    Elizondo and Garza perpetrated a scheme to defraud undocumented aliens by pretending to be agents of the Immigration and Naturalization Service ("INS") and by purporting to help the aliens with fake immigration forms. A jury convicted both Elizondo and Garza of conspiring to commit mail fraud and convicted Garza, additionally, of three substantive counts of mail fraud and of

obtaining money by pretending to be a federal employee. The court sentenced Elizondo to thirty-seven months imprisonment and Garza to ninety-seven months imprisonment. It also ordered $172,176 restitution to be paid jointly and severally by Elizondo, Garza, and a third co-defendant who is not before this Court.

## I. Sufficiency of the Evidence

Appellant Elizondo complains that the evidence was insufficient to support his conspiracy conviction. This claim has no merit. "The three elements of conspiracy to commit mail fraud are (1) an agreement between appellant[] and others (2) to commit the crime of mail fraud, and (3) an overt act committed by one of the conspirators in furtherance of that agreement." *United States v. Sneed*, 63 F.3d 381, 385 (5th Cir. 1995) (internal quotation marks omitted).[1] Additionally, the defendant must have acted with intent to defraud. *See United States v. Manges*, 110 F.3d 1162, 1173 (5th Cir. 1997).

Evidence adduced at trial established an immigration scheme through which the conspirators obtained money from undocumented aliens by promising them immigration services. Garza, sometimes assisted by Elizondo, had undocumented aliens fill out fake applications for INS residency authorizations or work permits. The conspirators misrepresented to the victims that they worked for the

---

[1] Mail fraud has the following essential elements: (1) a scheme to defraud, (2) use of the mails to execute the scheme, and (3) specific intent to defraud. *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005).

INS and that the applications were genuine. They initially charged the victims several hundred dollars as an "application fee" and subsequently sent the victims an "approval notice." The notices instructed the victims to submit an additional fee, generally $1202, to an "INS Department Ctr." in either Corsicana, Mesquite, or Pleasant Grove, Texas. Garza had created a company called "Independent National Services" (which has the same initials as the Immigration and Naturalization Service), and the addresses had been set up by the conspirators to send and receive mail relating to the scheme. Neither Garza nor Elizondo actually worked for or filed any papers with the INS, and none of the victims received the benefits they were promised. The conspirators defrauded at least 224 people of at least $172,176.

Trial evidence also revealed Elizondo's broad participation in the conspiracy. He assisted aliens in filling out what appeared to be "immigration paperwork" in exchange for money on multiple occasions. Additionally, Elizondo rented an office used to carry out the scheme, and one of the misleading "INS Department Ctr." post office boxes was opened in the name of his company, "Elizondo and Associates." Witnesses also testified that Elizondo collected mail addressed to "INS Department Ctr." and told his landlord that he and Garza "helped non US citizens with different types of paperwork." Lastly, fake immigration applications, fraudulent approval forms, receipts and other documents related to the scheme were found in common areas of the home that Elizondo shared with

3

Garza.

This evidence is clearly sufficient for a rational jury, viewing the evidence in the light most favorable to the Government, to have found all the elements of conspiracy to commit mail fraud beyond a reasonable doubt. *See United States v. Rivera*, 295 F.3d 461, 466 (5th Cir. 2002). We find no error in Elizondo's conviction.

## II. *Booker* Error

Next, Elizondo claims two different errors under *United States v. Booker*. First, Elizondo contends that the district court committed *Booker* error by ordering restitution under the Mandatory Victims Restitution Act of 1996 ("MVRA"). *See* 18 U.S.C. §§ 3663A–3664. Elizondo did not object below to the order of restitution or to the district court's use of the MVRA. His claim is, therefore, reviewable only for plain error. *See* Fed. R. Crim. P. 52. Under *United States v. Olano*, Elizondo must show that (1) there is an error, and that the error (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See, e.g.*, *United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005) (citing *Olano*, 507 U.S. 725, 732–34 (1993)).

Elizondo's argument fails at least the first two prongs of the *Olano* test. *Booker*'s holding that the Sentencing Guidelines are advisory does not directly affect the MVRA since it is a statute

4

"distinct and separate from the United States Sentencing Guidelines." *See United States v. Sosebee*, 419 F.3d 451, 462 (6th Cir. 2005). We agree with our sister Circuits, who have uniformly held that judicial fact-finding supporting restitution orders does not violate the Sixth Amendment. *See id.* at 461-62; *United States v. Reichow*, 416 F.3d 802, 808 (8th Cir. 2005); *United States v. Bussell,* 414 F.3d 1048, 1060-61 (9th Cir. 2005); *United States v. George*, 403 F.3d 470, 73 (7th Cir. 2005). In any event, even if there were *Booker* error in the restitution order, any error would certainly not be plain under current law.

Elizondo also claims that the district court committed *Booker* error by applying upward adjustments based on judicial fact-finding under the then-mandatory Federal Sentencing Guidelines.[2] The Government concedes (and we agree) that Elizondo preserved the error by making this claim below and citing *Blakely v. Washington*, 542 U.S. 296 (2004). Thus, we review under the harmless-error standard. The Government bears the burden of showing that *Booker* error was harmless, and to do so it must "prove beyond a reasonable doubt that the district court would not have sentenced [the defendant] differently had it acted under an advisory Guidelines

---

[2] Specifically, the district court adjusted Elizondo's sentence upwardly upon finding: (1) the offense caused a loss between $120,000 and $200,000 (U.S.S.G. § 2B1.1(b)(1)), (2) the offense involved more than 50 victims (U.S.S.G. § 2B1.1(b)(2)), and (3) the victims were unusually vulnerable (U.S.S.G. § 3A1.1(b)).

regime." *United States v. Akpan*, 407 F.3d 360, 377 (5th Cir. 2005). We have noted that this is an "arduous burden," and this Court "will ordinarily vacate the sentence and remand" where *Booker* error has been preserved. *United States v. Pineiro*, 410 F.3d 282, 284–87 (5th Cir. 2005) (quoting *United States v. Mares*, 402 F.3d 511, 520 n.9 (5th Cir. 2005)).

Indeed, this Circuit has held that the Government met its burden in showing *Booker* error harmless under only two circumstances. First, we have held that *Booker* error is harmless where the district court stated at sentencing that it would not impose a lower sentence even absent mandatory Guidelines. *See United States v. Saldana*, ___ F.3d ___, 2005 WL 2404810, at *10 (5th Cir. Sept. 30, 2005) (court stated it would impose "the same amount of imprisonment" even if the Guidelines were deemed unconstitutional)*; United States v. Nelson*, 2005 WL 1994287, at *1 (5th Cir. Aug. 19, 2005) (unpublished) (court expressed disappointment that there was not a greater statutory maximum and indicated that a sentence above the maximum would have been appropriate). Second, in an unpublished decision, we determined that *Booker* error was harmless where the sentencing court expressly refused to run the defendant's federal Guidelines sentence concurrently with his state sentence. *United States v. Prones*, 2005 WL 2009546, at *1 (5th Cir. Aug. 23, 2005) (unpublished). We find that the Government's evidence in the instant case falls

6

woefully short of the circumstances presented in these cases.

The Government contends that the *Booker* error was harmless because the district court sentenced Elizondo in the middle of the applicable Guidelines range. It claims that this proves the district court would not have sentenced Elizondo differently under an advisory regime because it already had discretion to impose a lower sentence and chose not to do so. It is equally possible, however, that the court's sentence reflected a judgment about the appropriate sentence for Elizondo relative to other defendants with the same Guidelines range rather than a judgment as to the appropriate absolute sentence. Indeed, this Circuit has rejected the claim that a court's decision to sentence in the middle of a Guidelines range establishes *Booker* error as harmless in two recent unpublished decisions. *See United States v. Yancey*, 2005 WL 1608590, at *1 (5th Cir. July 11, 2005) (unpublished) (per curiam); *United States v. Benavides*, 2005 WL 2055884, at *1 (5th Cir. Aug. 26, 2005) (unpublished).

The Government also points to the district court's statement that it might have the power to downwardly depart under the circumstances but that departure would not be appropriate on the record before it. Yet, even a discretionary departure decision is informed by the Guidelines and "thus sheds little light on what a sentencing judge would have done knowing that the guidelines were advisory." *United States v. Schlifer*, 403 F.3d 849, 854 (7th Cir.

7

2005).  No other evidence cited by the Government suggests that Elizondo would have received the same sentence under an advisory regime.  In sum, the Government has not met its burden of proving beyond a reasonable doubt that the *Booker* error was harmless. Because this *Booker* violation requires remand and resentencing, we need not address additional sentencing errors claimed by Elizondo.

## III. Conflict of Interest

Appellant Garza claims that the district court erroneously denied her counsel's motion to withdraw for conflict of interest without holding a hearing on the issue.  Specifically, Garza claims (1) that the district court should have held a hearing to determine whether her trial attorney faced an "actual conflict" and (2) that her conviction should be overturned on direct review even without a showing of prejudice.  *See Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980) (stating that trial courts have a "duty to inquire into the propriety of multiple representation" and that no showing of prejudice is required where there was an "actual conflict").[3] Both the denial of a motion to withdraw and the decision not to hold an evidentiary hearing are reviewed for abuse of discretion. *See United States v. Powell*, 354 F.3d 362, 370 (5th Cir. 2003); *United States v. Wild*, 92 F.3d 304, 307 (5th Cir. 1996).  The

---

[3] In the absence of *Cuyler*'s "actual conflict" exception, a defendant claiming that his attorney had a conflict of interest must show a reasonable probability that the conflict "prejudiced the defense, undermining the reliability of the proceeding." *Beets v. Scott*, 65 F.3d 1258, 1273 (5th Cir. 1995) (en banc).

8

district court's underlying determination as to whether an actual conflict existed, however, is reviewed *de novo*. *See United States v. Infante*, 404 F.3d 376, 390 (5th Cir. 2005).

On February 2, 2004, Garza pleaded guilty. In support of her plea, Garza submitted a factual resume, signed by her counsel, Roderick White, admitting her guilt on all counts. Four days later, Garza changed her plea to not guilty. On the first day of trial, White moved to withdraw as counsel, stating that he believed he had an ethical conflict because Garza intended to testify and he "[stood] by the representations [he] made on the 2nd." The district court denied the motion, inferring from these comments that Garza was changing her story and that White disbelieved her proposed testimony. It concluded that this was no reason to delay the trial. White never requested an evidentiary hearing on his conflict-of-interest claim nor disputed the court's understanding that White believed Garza intended to perjure herself. Garza eventually testified in narrative form, unassisted by counsel, and White did not use Garza's testimony in his closing.

Garza argues that *Cuyler*'s "actual conflict" rules should apply because her counsel signed the factual resume supporting her original guilty plea and because any defense would cast doubt on the truth of that filing, thereby subjecting White to professional sanctions for offering false evidence or testimony. These circumstances, however, do not give rise to an "actual conflict."

9

In *Beets v. Scott*, this Circuit "limited *Cuyler* to actual conflicts resulting from a lawyer's representation of multiple criminal defendants." *Hernandez v. Johnson*, 108 F.3d 554, 559 (5th Cir. 1997) (citing *Beets*, 65 F.3d 1258, 1266 (5th Cir. 1995) (en banc)).

Garza seeks to escape the *Beets* rule by pointing to our recognition that some cases might be "the functional equivalent of a joint representation" (and within *Cuyler*'s scope) even though the attorney did not "formally" represent two parties. *Beets*, 65 F.3d at 1267. The *Beets* Court made absolutely clear, however, that *Cuyler* only applies where an attorney was effectively, if not technically, representing multiple clients in the same proceeding. *See id.* Garza's claim, by contrast, involves (insofar as it involves any cognizable conflict) "an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client." *Beets*, 65 F.3d at 1260.

Garza also relies on the *Beets* Court's dictum that it had no "occasion to discuss the . . . powerful argument . . . that a lawyer who is a potential co-defendant with his client is burdened by a 'multiple representation' conflict . . . ." *Id.* at 1271 n.17. Yet, she cites no case that has actually considered this issue. Nor does she argue that White was actually a potential co-defendant. It is doubtful that White could be subject even to professional sanctions, as Garza claims. White made no personal

10

representations in the factual resume and is not responsible for assertions made by his client. TEXAS DISCIPLINARY RULES OF PROF'L CONDUCT 3.03, cmt. 2. Furthermore, the record reflects that White did not consider (much less know) that Garza's admissions in the factual resume could be false. *See id.* at 3.03(a)(5) (requiring knowledge of evidence's falsity). That defense evidence might cast doubt on the factual resume is therefore immaterial.[4] In short, Garza's claim falls within *Beets*'s broad conclusion that *Cuyler* should not apply to attorney self-interest cases. 65 F.3d at 1268–72.

Because the circumstances did not suggest an "actual conflict" under *Cuyler*, the trial court did not abuse its discretion in denying the motion to withdraw. *See United States v. Medina*, 161 F.3d 867, 870 (5th Cir. 1998). Lastly, because Garza's trial counsel did not make allegations that would give rise to a *Cuyler* conflict (and she makes none now), the trial court did not abuse its discretion in declining to hold a *sua sponte* evidentiary hearing. *See United States v. Powell*, 354 F.3d 362, 370 (5th Cir. 2003) (stating that courts should hold evidentiary hearings "when the defendant alleges sufficient facts which, if proven, would

---

[4] To the extent that Garza's claim implies that her counsel had a conflict of interest because he was precluded from presenting perjured testimony, we find such a suggestion baseless. *See Nix v. Whiteside*. 475 U.S. 157, 173–74 (1986). In any event, Garza insisted on taking the stand and was able to give her version of the facts in narrative form—a narrative which ultimately led to the district court finding at sentencing that she had committed perjury.

justify relief").[5]

## IV. Vulnerable Victims Sentencing Enhancement

Garza also claims that the district court's finding that the victims of her mail fraud scheme were unusually vulnerable was clearly erroneous. *See United States v. Angeles-Mendoza*, 407 F.3d 742, 747 (5th Cir. 2005) (reviewing a "finding of unusual vulnerability for clear error"). The Sentencing Guidelines provide a two-level sentencing enhancement where the victims of the crime are "unusually vulnerable due to age, physical or mental condition, or . . . otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, cmt. 2, n.1. The district court explained its finding at sentencing, stating that (1) Garza specifically targeted illegal aliens; (2) her victims "did not have much money, were unable to read, write or speak English well, if at all;" (3) her victims "lived with constant fear of deportation and permanent separation from their loved ones;" and (4) this fear of deportation and inability to communicate with the authorities made the individuals particularly vulnerable to Garza's scheme.

Garza claims that the section 3A1.1 enhancement was improper

---

[5] Garza argues only that her claim should be analyzed under *Cuyler*. Even if Garza were to make a typical conflict-of-interest complaint under *Strickland v. Washington*, 466 U.S. 668 (1984), however, that complaint would have to be made on collateral review. *See United States v. Holmes*, 406 F.3d 337, 361 (5th Cir. 2005) (stating that "direct appeal of ineffective assistance claims in the absence of presentment to the district court and an adequately developed record" is "generally preclude[d]" under Fifth Circuit precedent).

12

under *Angeles-Mendoza*, which held that a finding of unusual vulnerability could not be based solely on the inherent vulnerabilities of "smuggled aliens" where the offense at issue necessarily involved smuggled aliens. 407 F.3d at 747–48. Garza's *Angeles-Mendoza* argument fails for two reasons. First, the finding of unusual vulnerability in the instant case was not based on the inherent vulnerabilities of undocumented aliens but rather the specific vulnerabilities of the individual victims. The district court in *Angeles-Mendoza* merely found that in general "aliens coming from Mexico" have certain vulnerabilities. *Id.* at 747. The court in Garza's case observed several of her victims at trial and properly relied on these specific victims' poverty, language problems, and fears of deportation.

Second, the defendant in *Angeles-Mendoza* had been convicted of conspiring to smuggle, transport, and harbor illegal aliens. *Id.* at 745. Accordingly, the *Angeles-Mendoza* Court determined that the victims' "smuggled alien" status was adequately taken into account by the sentence for the base-level offense. *Id.* at 748. By contrast, none of the offenses at issue here—mail fraud, conspiracy, and impersonating a federal employee—necessarily involve undocumented aliens. The status of Garza's victims as undocumented aliens was not taken into account by the base-level offense and consequently would not be an improper consideration under *Angeles-Mendoza*. *See id.* at 748 n.7; *see also United States*

13

*v. Velasquez*, 310 F.3d 1217, 1220 (9th Cir. 2002).

Garza also relies on *United States v. Moree*, 897 F.2d 1329, 1335-36 (5th Cir. 1990), and *United States v. Box*, 50 F.3d 345, 358-59 (5th Cir. 1995). She argues that these decisions hold that a section 3A1.1 enhancement is improper where the vulnerability at issue was indispensable to the defendant's crime *as it was committed*. She contends that her victims' vulnerability could not properly be used to enhance her sentence because their particular vulnerabilities were essential to her particular scheme. Garza misreads *Moree* and *Box*. Those cases stand for the proposition that susceptibility to the defendant's scheme *alone* is not enough to qualify victims as unusually vulnerable. The victims must also be "vulnerable . . . members of society" and "fall in the same category" as "the elderly, the young, or the sick." *United States v. Gieger*, 190 F.3d 661, 665 (5th Cir. 1999) (citing *Moree*).

Thus, neither the wealthy businessmen victims in *Box* nor the government official victim in *Moree* could qualify as vulnerable victims under section 3A1.1, even though they were particularly susceptible to the crimes at issue in those cases, because they did not qualify as vulnerable members of society. Because Garza's victims' poverty, language problems, and fears of deportation did make them vulnerable members of society, *Moree* and *Box* are inapposite, and the district court's finding of unusual

14

vulnerability was not clearly erroneous.[6]

## V. Conclusion

Accordingly, we AFFIRM Elizondo's conviction for conspiracy to commit mail fraud but VACATE his sentence and REMAND for resentencing in accordance with *Booker.* As to Garza, we AFFIRM her convictions and sentence.

---

[6] For the first time on appeal, Garza also challenged her sentence under *Booker*. She acknowledges that she cannot show that the judge would have imposed a different sentence under advisory Guidelines. *See Mares*, 402 F.3d at 520(requiring such a showing to merit vacating a sentence under plain-error review). Furthermore, as Garza's reply brief concedes, her claim that her sentence violated the due process or ex post facto clause has been foreclosed by *United States v. Scroggins*, 411 F.3d 572, 576 (5th Cir. 2005). Therefore, Garza's additional sentencing claims fail.